DeCARLO, Judge.
On March 16, 1976, the grand jury of Covington County indicted the appellant for first degree murder. The indictment charged that Cleo D. Jackson “. unlawfully and with malice aforethought killed Roy Charles Crittenden by so operating the motor vehicle he was driving as to cause it to run into, over, upon, or against a vehicle in which the said Roy Charles Crit-tenden, was riding and thereby causing the death of Roy Charles Crittenden. . . . ”
The appellant was tried and found guilty of manslaughter in the first degree and punishment was fixed at two years imprisonment.
In support of this indictment the State presented the following evidence.
About twilight on Sunday, February 15, 1976, William Tunnell, Jr. was driving east on Highway 84, near the Conecuh River Bridge in River Falls, Alabama. It was shortly before 6:00 P.M., and he was accompanied by his wife and her seven-year-old daughter. Tunnell testified that the only automobile he passed was an east bound *42 1967 model Chevrolet just prior to reaching River Falls. The Chevrolet was occupied by one person and according to Tunnell, when he passed the Chevrolet, his car was traveling about 55 miles an hour. There was no oncoming traffic until Tunnell had driven over the Conecuh River Bridge and was half-way down the grade coming off of the bridge on the other side. Tunnell stated that at that point he met a Ford Torino traveling west. He went on to say that “the car was coming fast and it had no lights on, I say fast, it was approaching us and I didn’t notice how many people were in the car. ... I was approaching up to 55 after coming off the bridge and the car in my estimation was going at least as fast as I was.”
Tunnell recalled, “I noticed the car because at the time I had my lights on while the rest of the cars we had seen that day at that time had their lights on and this car did not have its lights on. It ran off the road some distance in front of us and seemed to be off the road as it passed us.” Tunnell said he last saw the Ford Torino when it passed him headed for the bridge.
Tunnell testified that he traveled some one hundred yards further down Highway 84, turned around and returned to a point east of the bridge where two vehicles had collided. He recognized one of the vehicles as the Ford Torino that he had met moments earlier as he came off the bridge. The other vehicle was the eastbound Chevrolet that he had passed in front of Huggins farm on the outskirts of River Falls. After recognizing the vehicles involved, Tunnell turned around and drove to a service station where he called the Andalusia Police Department.
During cross-examination, Tunnell said he could not precisely say how far off the road the Ford was as it passed him, but said, “I just saw it kicking up dust.”
In describing the scene of the accident Tunnell testified that the 1967 Chevrolet was off of the road “. . .it was up on the flat part of the road which goes . approaches the bridge, turned around in the opposite direction.” He said the Chevrolet was on his left as he was coming back on Highway 84, and the Torino was in the middle of the road just to his right of the Chevrolet.
C. R. Wages testified that he lived at the river on Highway 84, and recalled that on February 15, 1976 about sundown he saw and heard an automobile collision. According to Wages, his brother-in-law, Ed Bled-sole, was with him at the time he heard the collision and they went from his house up the hill to the highway where “two cars had run together.” Wages recalled that the Ford Torino was sitting “almost in the middle of the road” and the Chevrolet “was almost off the road.” He explained that, approaching the bridge going west, the Chevrolet would be on the south side of the road.
Wages stated there was one person in each of the cars but he did not recognize either one. He said that when he got to the Torino, he saw a man, apparently unconscious, lying across the front seat. Wages straightened the man’s head up but stated he did not smell alcohol at the time, but did smell gasoline.
Wages and his brother-in-law were the first ones on the scene. Wages said that a car occupied by a male and a female came from the east and stopped. The occupants got out of the car but subsequently returned to the car and drove off. Wages said that he neither recognized the occupants nor did he recognize Mr. Tunnell and his wife as any of the persons who were present on the night of the collision.
M. D. Gantt, was the chief of police of River Falls, Alabama, and on Sunday evening, February 15,1976, he investigated the automobile collision at the Conecuh River Bridge.
He recalled that when he arrived at the scene, he recognized Cleo Jackson’s vehicle, went over to the car, and checked the appellant for a pulse beat. Gantt explained that he knew Cleo Jackson because he lived near him. He stated that he did not recognize the person in the other car involved in the collision and that he did not find a pulse beat on him.
*43 On cross-examination, Gantt testified' that Jackson’s “leg was up under the dash and half of his body was over the back seat.” Gantt stated that he did not smell any alcohol but could smell gas.
Robert Harrell, an Alabama State 'Trooper for approximately six and one-half years, acknowledged that as a trooper he had received training in, and, had conducted investigations of automobile and truck collisions. He went on to relate that prior to being a State trooper he was a police officer and had made such investigations, and had continued to do so for the eight years that he was so employed. He acknowledged that in determining the point of impact of vehicles involved in a collision, skid marks and debris from the wreckage were considered.
Harrell testified that in response' to a “call” received at 5:55 P.M., on Sunday, February 15, 1976, he went to the Conecuh River Bridge in River Falls, Alabama, to investigate a collision. Upon arrival at the scene, he saw M. C. Gantt, State Trooper Connie D. Fowler, and Richard Morrison. He acknowledged that he had made measurements and taken pictures during his investigation. He identified the appellant’s vehicle and the vehicle belonging to the victim.
In response to questioning, Harrell stated that at the scene of the collision he found skid marks off the paved portion of the road going west. Further, he said he did not find any skid marks leading back from the direction of the two vehicles involved in the collision. Over objections, he acknowledged that he determined the location of the point of impact to be in the eastbound lane of traffic coming from River Falls to Andalusia. He stated his determination was based on “where the pavement had been cut into with some type of metal and also some type of debris.” Harrell explained that the debris was glass and dirt, and that the cuts in the pavement “were fresh.” He also marked State exhibit photographs to show the point of impact, and identified photographs showing the appellant’s and the victim’s car. Harrell testified that he had measured the distance from the east end of the bridge to the point of impact and determined it to be thirty-eight feet.
After making his investigation of the collision, Harrell went to the hospital, saw the appellant and the victim, and received a blood sample from Ben Stanley. According to Harrell, there were two tubes with one sample in each. He kept the samples in his possession until he carried them to the crime lab in Enterprise on February 18, 1976, where he then gave them to Dale Carter. He explained that he stored the blood samples in his refrigerator and when removed, they were in the same condition as they were when placed there.
During cross-examination, Harrell stated that debris was scattered over a portion of the highway and that it appeared to be a head-on collision. He went on to say that the point of impact was some eighteen inches from the yellow line in the eastbound lane. He admitted, however, that his determination of the point of impact amounted to a deduction.
During re-direct examination, Harrell said that he was taught that the best time to determine the point of impact was “soon as possible before any vehicle was moved.”
On re-cross examination, Harrell acknowledged that prior to the accident, he had never been at the scene where the collision occurred and looked at the pavement. He revealed that his deduction of the point of impact was based on the presence of the “fresh marks” on the pavement. Further, he noted that the speed limit at the site of the collision was 40 miles per hour but “a distance on down” the limit was increased to 55 miles per hour.
Benjamin Stanley, a medical technologist at the Andalusia Hospital laboratory on February 15, 1976, recalled seeing the appellant in the emergency room. According to him, Dr. Wayne Johnson was in charge that night, and he directed Stanley to take a blood sample from Cleo Jackson, the appellant. Stanley said that he also took a blood sample from the victim, Roy Charles Crittenden. Both samples were placed in a *44 vacuum container with an anticoagulant, and they were then sealed and labeled and given to a State trooper.
During cross-examination, Stanley stated that he did not remember the name of the State trooper but that he had given the sample to him “prior to my leaving the hospital, shortly after the specimen was drawn, I don’t know exactly how many minutes.”
According to Stanley, he did not talk to the appellant and did not remember whether or not he was conscious. He could not say how many blood samples were taken from the appellant but that the blood samples were taken in the emergency room. He stated that the samples were labeled and then placed in the refrigerator. Stanley explained that although others had access to the refrigerator they were not there at the time.
Dr. Wayne Johnson treated Cleo Jackson at the Andalusia Hospital on the night of the collision. Dr. Johnson said that during his examination he ordered a blood sample be taken and that he detected the odor of alcohol about the patient.
The doctor agreed that in his professional opinion a person having .32 percent ethyl alcohol content in his blood would be intoxicated.
On February 18, 1976, Dale Carter, a criminalist and director of the Enterprise region of the crime laboratory, received from Trooper Harrell, blood samples belonging to the victim and the appellant. The samples were then turned over to toxicologist, Dr. C. R. McCahan, Jr.
Dr. McCahan testified that he received two green stoppered vacuum tubes containing blood samples belonging to the victim and the appellant. He stated that after running a microchemical analysis, he found that the blood sample belonging to Roy Charles Crittenden did not reveal the presence of ethyl alcohol, but the sample belonging to Cleo D. Jackson revealed .32 percent ethyl alcohol.
Corporal J. C. Fowler of the Alabama State Troopers, acknowledged that a portion of his training had been in the investigation of vehicle collisions. His training involved measurements, looking at debris, skid marks to determine point of impact, and ascertaining the path of the vehicle immediately before and after the accident.
Fowler was in charge of the investigation of the collision in question and on February 15, 1976, he assisted Trooper Harrell in the investigation of the collision at the Conecuh River Bridge. Fowler stated that the day following the collision he returned to the scene and found scuff marks on the west side of the road going west where the vehicle was in “a partial side skid which cut up and pushed the grass down.” Fowler said, “that you could follow the exact tracks off the edge of the pavement from the point of impact back up to the side of the highway.” He testified that the grass had been disrupted by some ninety to one-hundred feet back toward Andalusia and there were thirty-five to forty feet of track leading from the point of the impact to the edge of the highway.
During cross-examination, Fowler stated that besides the vehicles involved, there were as many as one-hundred other vehicles parked near the scene. He said, however, that the scuff marks appearing on the photographs, in his opinion, were those made by the accident.
Forrest Hobson, a funeral director in Andalusia, and county coroner, testified that he viewed the body of Roy Charles Critten-den and determined that the cause of death was a broken neck.
At the end of Hobson’s testimony, the State rested and the defendant made a motion to exclude the State’s evidence. The motion was denied and the defense recalled Clem Wages for further cross-examination.
Clem Wages testified he was at the scene of the collision the next day and did not observe any skid marks or scuff marks across the road. Further, he said he did not see any indication of skid marks along the side of the road on the grass.
*45 Cleo Jackson testified in his own behalf, that he was thirty-six years old, married with two children, and that his wife was a cousin to the deceased, Roy Charles Critten-den. According to Jackson, the night prior to the collision, he drank some beer during a family fish-fry at his house. He said that he did not recall how many beers he drank but that he had gone to bed about 11:00 or 11:30 P.M. Jackson said around 8:00 o’clock the next morning he went to Andalusia to see a fellow-worker but he was not at home. Later that afternoon he returned to Andalusia and after seeing him, he went to see Archie Parker. Jackson testified that after leaving Parker’s house he headed for River Falls on Highway 84. He said he thought his headlights were on but he could have been mistaken. According to Jackson, when he got to the bridge he met a car that was coming over on his side of the highway. He stated “that is when I started throwing on brakes and slowing up and that is the last thing I remember.”
Jackson reiterated the last time that he had anything to drink was the night before the accident and the next day he was sober. He stated he gave no one permission to take his blood and he learned that a blood sample was taken after he regained consciousness.
After calling four character witnesses who testified that the appellant’s general reputation in the community was good and that his reputation for truth and veracity was also good, the defense completed its case.
I
It is contended that the evidence was insufficient to sustain a conviction of first degree manslaughter and that the trial court erred in refusing appellant’s request for the affirmative charge and his motion for a new trial.
This court in Roden v. State, 44 Ala.App. 483, 213 So.2d 865, stated the elements of manslaughter in the first degree. It went on to say that one could drive an automobile in such a manner as to evidence a wanton and reckless disregard, and if such proximately causes the death of another, the driver would be guilty of manslaughter in the first degree.
From the testimony of Mr. Tunnell, it could reasonably be inferred that the appellant just prior to the collision was driving his car in such a manner as to evidence a wanton and reckless disregard of human life. The testimony of the investigating officers indicated that the point of impact was some eighteen inches from the center of the line in the victim’s path of travel. The testimony from the toxicologist indicated that a blood sample taken from the appellant showed .32 percent ethyl alcohol, which, according to Dr. Johnson would indicate that the appellant was intoxicated at the time of the collision.
Under these circumstances, the evidence presented raised questions of fact for the jury, and such evidence, if believed, was sufficient to sustain the conviction. Refusal to give the affirmative charge or to grant a new trial was proper under these circumstances. Van Nostrand v. State, 56 Ala.App. 141, 319 So.2d 760; Drummond v. State, 37 Ala.App. 308, 67 So.2d 280; Young v. State, 283 Ala. 676, 220 So.2d 843.
II
The appellant contends that the testimony of the State troopers regarding the point of impact was improper and erroneously admitted. Counsel argues this testimony was not the result of a hypothetical question and was utterly without facts. The appellant relies on Jowers v. Dauphin, 273 Ala. 567, 143 So.2d 167, for support. The Supreme Court of Alabama in that case, said that a highway patrolman who was not present at the time of the collision could not testify to the speed of the vehicle. The court went on to say “skid marks [on] the road or highway were made at the time of the impact and the witness may not testify as to the speed of the vehicle simply by observing these local conditions and viewing the damage to the vehicles.”
In our judgment, the facts in the present case are distinguishable from those decided in Jowers v. Dauphin, supra.
*46 In Holt v. State, 26 Ala.App. 223, 157 So. 449, a case whose facts parallel those in the case at bar, this court said:
“. . . [A] witness not present at the time of the accident, but, arriving immediately afterwards, examined the road and found marks and signs of the accident which indicated that the cars collided on the right-hand side of the road going west. ... is one of the exceptions to the general rule that witnesses must depose to facts in detail, leaving to the jury the finding of the conclusion. The testimony is classed as a collective fact.”
See also Madison v. State, 40 Ala.App. 62, 109 So.2d 749.
In the present case, Officer Harrell said that he had receive the “call” at 5:55 P.M., and that within five minutes he arrived at the scene. He said at the time of his arrival J. C. Fowler and another State trooper were already present.
According to Mr. Tunnell’s testimony, the accident occurred between 5:55 and 6:00 P.M., and under these circumstances it could reasonably be inferred that the State troopers arrived very soon after the collision. Further, Trooper Harrell stated that his conclusion as to the point of impact was based on his observation of the debris and the cuts in the pavement, and such observations were made before the vehicles were moved.
In our judgment, once a witness has detailed to the jury what conditions and circumstances he found and observed at the scene of the collision, it is not error to allow testimony concerning the point of impact along with the details of conditions and circumstances observed immediately after the collision.
Ill
During cross-examination of one of the defendant’s character witnesses, the State asked the following questions:
“Q. Alright, I want to ask you some other questions. Do you know, or had you been told, back on August 9, 1958, in the City of Andalusia he was arrested for reckless driving?
“A. Nineteen when?
“Q. 1958.
“A. Who was arrested?
“Q. Cleo Jackson.
“MR. JONES: We object to that, Your Honor.
“THE COURT: Overruled.
“A. I don’t know about it.
“Q. Alright, you hadn’t heard anything or anybody tell you about it so you don’t know?”
It is from this ruling that the appellant now appeals and contends that the trial court was in error in making such a ruling.
In Frazier v. State, 56 Ala.App. 166, 320 So.2d 99, Judge Harris writing for a unanimous court said:
“Where witnesses testified as to the good reputation of the defendant, it was permissible on cross-examination to test their knowledge of the defendant’s reputation by asking if they had heard of specific acts of the defendant that tended to mitigate against his reputation or character.”
In the instant case the record indicates that on direct examination, the witness was asked:
“Q. Alright, now. I want to ask you, at the time of the accident, concerned with this case on February 15th and ask you, Mr. Bradley, do you know the general reputation of the defendant in the community where he resided at, at that time?
“A. His reputation was considered good at that time.
“Q. Alright, do you know his general reputation in the community where he resided at the time, February 15th for truth and veracity?
“A. Yes, sir.
“Q. Truthfulness is that reputation good or bad?
“A. Good.”
As can be seen from the above portion of the record, the inquiry was as to general character and not limited to general character for truth and veracity. Vaughn v. *47 State, 17 Ala.App. 383, 84 So. 879. Under these circumstances it was proper for the State to ask the witness if he had been told of the appellant’s reckless driving arrest for the purpose of either showing that the witness was mistaken in his estimate of the appellant’s general character or for shedding light on his estimate of such character. Frazier v. State, supra; Stout v. State, 15 Ala.App. 206, 72 So. 762. Therefore, under these circumstances, the court was correct in overruling the objection.
IV
The appellant maintains that it was error for the trial court to permit the testimony of State Trooper Fowler concerning the conditions at the scene the next day. Counsel argues that without showing similarity in essential conditions, such testimony was improper.
We have examined the portions of Trooper Fowler’s testimony involving his visit to the scene the day after the collision and fail to see an objection interposed during the offering of this particular testimony. Without objection on this specific point, this court is without authority to review such a claim of error.
V
Appellant next asserts that the trial court erred when it permitted the State to present testimony of the results of an analysis of a blood sample taken from the deceased.
We have searched the record and particularly the testimony of the toxicologist, Dr. McCahan, to determine whether or not an objection had been interposed to the testimony concerning the results of the analysis of the deceased’s blood. Nowhere did we find an objection, and without such an objection on this specific point, we are without authority to review.
VI
The appellant insists that the trial court was in error when it allowed the district attorney to ask the defendant’s character witness, a relative of both the defendant’s wife and the deceased, whether the deceased drank. Counsel complains that the character of the deceased was not in issue and the question and response was highly prejudicial to the defendant.
The direct examination of this character witness shows that he was questioned generally as to his knowledge concerning the deceased, Charles Roy Crittenden.
From the record:
“Q. And you know the deceased, Charles Roy Crittenden?
“A. Yes sir.
“Q. And are you related to Charles Roy Crittenden?
“A. Yes, sir.
“Q. What is the relationship, what degree?
“A. Well about as much as one as the other.
“Q. You related to Cleo Jackson’s wife too?
“A. Yes, sir.
“Q. You are cousins?
“A. Yes, sir.
“Q. So you are related to the deceased and also to the defendant’s wife?
“A. Yes, sir.”
It is well recognized that the latitude and extent of cross-examination is a discretionary matter of the trial court and in the absence of prejudicial abuse it will not be reviewed. Connell v. State, 294 Ala. 477, 318 So.2d 710.
As can be seen from the foregoing testimony, it was appellant’s counsel who first inquired as to this witness’s knowledge of the deceased. Since this matter had previously been injected into the evidence by counsel for the defense, it then became a proper basis for inquiry on cross-examination. McClendon v. State, 54 Ala.App. 327, 307 So.2d 723.
VII
The appellant complains the trial court committed reversible error when it refused all of defendant’s written requested charges except one.
*48 We have reviewed the court’s oral charge and the appellant’s written requested charge that was given. The remaining twenty-six refused charges we have carefully examined and find they were properly refused. They were either affirmative in nature, incorrect statements of the law, argumentative, and invasive of the province of the jury or were fully and substantially covered in the trial court’s oral charge. Therefore, the court’s refusal to give those charges was not improper. T. 7, § 273, Code of Alabama 1940, Recompiled 1958.
No error appearing in the record the case is due to be affirmed.
AFFIRMED.
TYSON, P. J., and HARRIS and BOWEN, JJ., concur.
BOOKOUT, J., concurs in result.